S07A1043. MANN v. GEORGIA DEPARTMENT OF
CORRECTIONS et al.
(653 SE2d 740)

HUNSTEIN, Presiding Justice.

This case involves a constitutional takings challenge to OCGA § 42-1-15, which prohibits registered sex offenders from residing or loitering at a location that is within 1,000 feet of any child care facility, church, school or area where minors congregate (the "residency restriction"), id. at (a), or being employed by any business or entity located within 1,000 feet of any child care facility, church or school (the "work restriction"). Id. at (b) (1).[1] Appellant Anthony Mann is a registered sexual offender,[2] see OCGA § 42-1-12 (a) (20) (B),

---

[1] Individuals classified as sexually dangerous predators under OCGA § 42-1-12 (a) (21) are additionally prohibited from being employed by any business or entity located within 1,000 feet of an area where minors congregate. OCGA § 42-1-15 (b) (2).

[2] Mann pled nolo contendere in 2002 to a North Carolina charge of taking indecent liberties with a child.

who previously challenged the predecessor to OCGA § 42-1-15[3] when its application required him to vacate his residence at his parents' home. In *Mann v. State*, 278 Ga. 442 (603 SE2d 283) (2004), we rejected his takings challenge to the residency restriction on the basis that he had only a minimal property interest in the living arrangement he enjoyed at his parents' home. Id. at 443 (2). The record here establishes that appellant moved from his parents' home, got married in August 2003 and purchased, together with his wife, a home on Hibiscus Court in Clayton County in October 2003. It is uncontroverted that the home at the time it was purchased was not within 1,000 feet of any child care facility, church, school or area where minors congregate. Around October 2004, appellant became the half owner and day-to-day operator of a Clayton County business, a barbecue restaurant, where he cooks and runs the dining room among other duties. It is likewise uncontroverted that the business, at the time it leased its current premises, was not located within 1,000 feet of any child care facility, church or school.

However, child care facilities thereafter located themselves within 1,000 feet of both appellant's home and his business. Appellant's probation officer then demanded that appellant quit the premises of his business and remove himself from his home upon penalty of arrest and revocation of probation. See OCGA § 42-1-15 (d). Appellant brought this action seeking a declaration that OCGA § 42-1-15 is unconstitutional, inter alia, because it "authorizes the regulatory taking of his property without any compensation as required by the Constitution of the United States, as well as the Constitution of the State of Georgia." The trial court rejected appellant's arguments and he appeals. For the reasons that follow, we affirm in part and reverse in part the trial court's order.

1. We address first appellant's constitutional challenge to the residency restriction in OCGA § 42-1-15 (a). Under the terms of that statute, it is apparent that there is no place in Georgia where a registered sex offender can live without being continually at risk of being ejected. OCGA § 42-1-15 contains no "move-to-the-offender" exception to its provisions. Compare, e.g., Ala. Code § 15-20-26 (e) (2007) ("[c]hanges to property within 2,000 feet of an adult criminal sex offender's registered address which occur after an adult criminal sex offender establishes residency or accepts employment shall not form the basis for finding that a criminal sex offender is in violation of" residency/work restrictions); Iowa Code § 692A.2A (4) (c) (2006)

---

[3] Former OCGA § 42-1-13, which restricted registered sex offenders from residing within 1,000 feet of a child care facility but which did not affect where registered sex offenders were employed, was repealed in 2006 and its provisions, as amended, were recodified as OCGA § 42-1-15. See Ga. L. 2006, p. 379, § 24.

(sex offender "residing within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility does not commit a violation of this section if any of the following apply: . . . a school or child care facility is newly located on or after July 1, 2002"). Thus, even when a registered sex offender like appellant has strictly complied with the provisions of OCGA § 42-1-15 at the time he established his place of residency, the offender cannot legally remain there whenever others over whom the offender has no control decide to locate a child care facility, church, school or "area where minors congregate," as that term is defined in OCGA § 42-1-12 (a) (3),[4] within 1,000 feet of his residence. As a result, sex offenders face the possibility of being repeatedly uprooted and forced to abandon homes in order to comply with the restrictions in OCGA § 42-1-15.

Further, OCGA § 42-1-15 is part of a statutory scheme that mandates public dissemination of information regarding where registered sex offenders reside. OCGA § 42-1-12 (i). Thus, third parties may readily learn the location of a registered sex offender's residence. The possibility exists that such third parties may deliberately establish a child care facility or any of the numerous other facilities designated in OCGA § 42-1-12 within 1,000 feet of a registered sex offender's residence for the specific purpose of using OCGA § 42-1-15 to force the offender out of the community. See D. Hunter & P. Sharman, Peach Sheet: Crimes and Offenses, 23 Ga. St. U. L. Rev. 11, 19 (2006) (quoting "candid" comment at Senate Judiciary Committee hearing that residency/work restrictions in OCGA § 42-1-15 will force sex offenders "in many cases [to] have to move to another state, and that's the greatest protection I think any of us can offer our kids"). A registered sexual offender who knowingly fails to quit a residence that is located within 1,000 feet of any of the facilities or locations designated in the statute commits a felony punishable by imprisonment for not less than ten nor more than thirty years. OCGA § 42-1-15 (d).[5]

As the United States Supreme Court recognized in *Lingle v. Chevron U.S.A., Inc.*, 544 U. S. 528, 537 (125 SC 2074, 161 LE2d 876) (2005),

---

[4] " 'Area where minors congregate' shall include all public and private parks and recreation facilities, playgrounds, skating rinks, neighborhood centers, gymnasiums, school bus stops, and public and community swimming pools."

[5] This provision "does not increase the punishment meted out to previously convicted sex offenders. It does not punish sex offenders retrospectively on the basis of their status. It simply declares that convicted sex offenders who *currently* reside within certain well-defined areas are guilty of a felony." *Thompson v. State*, 278 Ga. 394, 396 (603 SE2d 233) (2004).

government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster — and that such "regulatory takings" may be compensable under the Fifth Amendment.

Accord *Mann*, supra, 278 Ga. at 443 (2).

Regulations that fall short of eliminating property's beneficial economic use may still effect a taking, depending upon the regulation's economic impact on the landowner, the extent to which it interferes with reasonable investment-backed expectations, and the interests promoted by the government action.

(Footnotes omitted.) Id. This language reflects the "essentially ad hoc, factual inquiries" set forth in *Penn Central Transp. Co. v. New York City*, 438 U. S. 104, 124 (98 SC 2646, 57 LE2d 631) (1978), which rejected any set formula and instead listed certain factors to be used to

identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, [the *Penn Central* test] focuses directly upon the severity of the burden that government imposes upon private property rights. . . . [T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

*Lingle*, supra at 539-540. We apply these guidelines to resolve appellant's claim that OCGA § 42-1-15 (a) constitutes an unconstitutional regulatory taking of his property. Accord *Mann*, supra.

Although we earlier determined appellant's property interest in his rent-free residence at his parents' home to be "minimal," *Mann*, supra, 278 Ga. at 443 (2), we find appellant's property interest in the Hibiscus Court residence he purchased with his wife to be significant. As a registered sex offender, the locations where appellant may reside are severely restricted by OCGA § 42-1-15 (a); as recognized by other states, those locations may also be subject to private limitations, see *Mulligan v. Panther Valley Prop. Owners Assn.*, 766 A2d 1186 (N.J. Super. Ct. App. Div. 2001) (discussing homeowner association covenants prohibiting sale of property to sex offenders), and we note that nothing in OCGA § 42-1-12 et seq. expressly precludes Georgia cities and counties from enacting additional restrictions. See Wernick, In

Accordance with a Public Outcry: Zoning Out Sex Offenders Through Residence Restrictions in Florida, 58 Fla. L. Rev. 1147, 1163-1164 (2006) (discussing ordinances enacted by local governments in Florida that have expanded state statutory buffer zones). Nevertheless, appellant and his wife were able to find and purchase a house that complied with the residency restriction in OCGA § 42-1-15. The evidence is uncontroverted that the Hibiscus Court property was purchased for the sole purpose of serving as their home. OCGA § 42-1-15, by prohibiting appellant from residing at the Hibiscus Court house, thus utterly impairs appellant's use of his property as the home he shares with his wife. E.g., *PruneYard Shopping Center v. Robins*, 447 U. S. 74, 83 (100 SC 2035, 64 LE2d 741) (1980) (under *Penn Central* economic impact factor, assessment is whether use of owners' property as a shopping center was unreasonably impaired); *Allegretti & Co. v. County of Imperial*, 138 Cal. App. 4th 1261 (IV) (B) (12) (42 Cal. Rptr. 3d 122) (Cal. App. 2006) (use to which property owner puts his or her property important in addressing economic impact factor). See also *Duffield v. DeKalb County*, 242 Ga. 432, 433-434 (2) (249 SE2d 235) (1978) (property is taken under Georgia Constitution when owner's right to "possess, use, enjoy and dispose of it" impaired).

Unlike the situation in the typical regulatory takings case, the effect of OCGA § 42-1-15 is to mandate appellant's immediate physical removal from his Hibiscus Court residence. It is "functionally equivalent to the classic taking in which government directly . . . ousts the owner from his domain." *Lingle*, supra, 544 U. S. at 539. As long as the day care center remains in its current location, appellant cannot reside in his home until he is released from the registration requirement by a superior court, OCGA § 42-1-12 (g), which cannot occur until a minimum period of ten years has passed after his release from probation. Id. at (g) (2) (B). He cannot legally live with his wife at their home but must instead locate another residence that complies with the residency restriction. Assuming such a residence can be located, he is faced with the financial burden of maintaining both residences until he and his wife can sell or rent the Hibiscus Court property.

Although the State contends that appellant's ability to rent or sell his house eliminates or minimizes the economic impact of OCGA § 42-1-15 (a), appellant's testimony established that he and his wife did not purchase the Hibiscus Court property for rental purposes and that neither he nor his wife are real-estate speculators. Even assuming, arguendo, that appellant can lawfully engage in the business of renting a property located within 1,000 feet of a day care center, OCGA § 42-1-15 would thus be used to force appellant and his wife to become lessors, an unwelcomed and unanticipated role for which they

are ill-equipped. Sale of the Hibiscus Court house, if a purchaser can be found, will involve numerous expenses, such as closing costs, attorney fees and realtor commissions, and appellant would face those costs again, plus additional expenditures such as escrow deposits and utilities transfers, in purchasing a new residence. We thus reject the State's position that appellant has failed to demonstrate a significant economic impact from application of OCGA § 42-1-15 to his situation. Contra *Doe v. Baker*, 2006 U. S. Dist. LEXIS 67925 (N.D. Ga. 2006) (fact that plaintiff is prohibited by predecessor to OCGA § 42-1-15 from living in his own home does not alone demonstrate significant economic impact).

Moreover, OCGA § 42-1-15 looms over every location appellant chooses to call home, with its on-going potential to force appellant from each new residence whenever, within that statutory 1,000-foot buffer zone, some third party chooses to establish any of the long list of places and facilities encompassed within the residency restriction.[6] While this time it was a day care center, next time it could be a playground, a school bus stop, a skating rink or a church. OCGA § 42-1-15 does not merely interfere with, it positively precludes appellant from having any reasonable investment-backed expectation in any property purchased as his private residence. See *Dodd v. Hood River County*, 136 F3d 1219 (V) (2) (9th Cir. 1998) (owners of forest land purchased for retirement home could establish only minimal investment-backed expectations in property due to state regulations regarding type of dwellings permitted in forest).

In *Mann*, supra, 278 Ga. at 443-444 (2), we recognized the strong governmental interests that are advanced by the residency restriction now codified in OCGA § 42-1-15 (a). However, even assuming, arguendo, that the substantiality of the public purpose advanced by a regulation is still pertinent to a takings challenge, but see *Lingle*, supra, 544 U. S. at 540 (II) (B),[7] we cannot overlook the significant,

---

[6] OCGA § 42-1-15 affects not only the location of appellant's residence but also such essential economic decisions as whether to rent or purchase, the duration of any lease to be signed, the financial terms for any mortgage used for a new home's purchase, whether to invest funds in improving the property, etc.

[7] The United States Supreme Court in *Lingle* recognized that substantive due process, with its focus on the legitimacy of the government's exercise of power, and the takings clause, with its focus on the magnitude or character of the burden a particular regulation imposes upon private property rights and the distribution of the regulatory burden among property owners, involve two fundamentally different tests. As the *Lingle* Court explained, a due process inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property "*for public use.*" It does not bar government from interfering with property rights, but rather requires compensation "in the event of *otherwise proper interference* amounting to a taking." [Cit.] Conversely,

adverse economic impact of OCGA § 42-1-15 on appellant, the physical ouster that it effects or its elimination of any investment-backed expectations in appellant's residence. Moreover, we must recognize that OCGA § 42-1-15 effectively places the State's police power into the hands of private third parties, enabling them to force a registered sex offender like appellant, under penalty of a minimum ten-year sentence for commission of a felony, to forfeit valuable property rights in his legally-purchased home.

> [C]ourts must remain mindful that the Takings Clause is intended to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "

(Footnotes omitted.) *Mann*, supra, 278 Ga. at 443 (2). All of society benefits from the protection of minors, yet registered sex offenders alone bear the burden of the particular type of protection provided by the residency restriction in OCGA § 42-1-15 (a). No burden is placed on third parties to aid in providing this protection, even though they have been enabled to do so by the mandated public dissemination of the addresses of registered sex offenders. OCGA § 42-1-12 (i). Looking to the magnitude and character of the burden OCGA § 42-1-15 imposes on the property rights of registered sex offenders and how that burden is distributed among property owners, *Lingle*, supra, 544 U. S. at 542; see also *Mann*, supra, we conclude that, under the circumstances present here, justice requires that the burden of safeguarding minors from encounters with registered sexual offenders must be "spread among taxpayers through the payment of compensation." *Lingle*, supra at 543. We therefore find that OCGA § 42-1-15 (a) is unconstitutional to the extent that it permits the regulatory taking of appellant's property without just and adequate

---

if a government action is found to be impermissible – for instance because it fails to meet the "public use" requirement or is so arbitrary as to violate due process – that is the end of the inquiry. No amount of compensation can authorize such action. Id. at 543. In other words, "the focus of the takings analysis is on whether the government act takes property, not on whether the government has a good or bad reason for its action." (Footnote omitted.) Barros, At Last, Some Clarity: The Potential Long-Term Impact of Lingle v. Chevron and the Separation of Takings and Substantive Due Process, 69 Alb. L. Rev. 343, 354 (2005). Accordingly, the *Lingle* Court, recognizing that "[a] test that tells us nothing about the actual burden imposed on property rights, or how that burden is allocated, cannot tell us when justice might require that the burden be spread among taxpayers through the payment of compensation," *Lingle*, supra at 543, disavowed the "substantially advances" test in *Agins v. City of Tiburon*, 447 U. S. 255 (100 SC 2138, 65 LE2d 106) (1980) as a "means-ends" due process test that "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." *Lingle*, supra at 542.

compensation. Accordingly, we reverse the trial court's ruling denying appellant's request for declaratory relief in regard to the residency restriction.

2. Appellant also contends that the work restriction in OCGA § 42-1-15 (b) (1) violates the takings clauses of the United States and Georgia Constitutions. Applying the analysis set forth in Division 1, supra, we conclude the trial court did not err by rejecting appellant's challenge. The evidence presented by appellant established that he owns a half interest in a business that operates a barbeque restaurant. The business in November 2004 entered into a three-year lease for the premises where the restaurant is operated; the lease provides for automatic renewal of its terms. Appellant testified that the restaurant opened its doors in June 2005 and had not, as of the October 2006 hearing, yet begun to show a profit. Appellant testified that he runs the dining room, does some cooking and performs accounting work. He testified that the restaurant has an accountant, one server, a full-time cook and a part-time dish washer. Although appellant testified that the business suffered as a result of his absence from the restaurant, he also testified that he could "take a computer and [his] papers and so forth" and perform tasks without being physically present at the restaurant.

OCGA § 42-1-15 (b) (1) provides that no registered sex offender "shall be employed by . . . any business or entity that is located within 1,000 feet of a child care facility, a school, or a church." We find that the work restriction, as is the case with the residency restriction, "aims to lessen the potential for those offenders inclined toward recidivism to have contact with, and possibly victimize, the youngest members of society." *Mann*, supra, 278 Ga. at 444 (2). Construing OCGA § 42-1-15 (b) (1) in light of this legislative aim, we hold that nothing in the statute prohibits a registered sex offender from owning a business or entity within the 1,000-foot buffer zone around child care facilities, schools and churches, as long as that ownership does not involve the sex offender's physical presence at the business or entity so as to enable the sex offender to come into contact with any children who may be attending the child care facility, school or church.

Appellant's property interest in the business in which he owns a half-interest is considerable. However, nothing in OCGA § 42-1-15 (b) (1) compels appellant to divest himself of that ownership interest in the business or to relocate the business in order to maintain his interest in it. Although the statute's work restriction does directly deprive appellant of his right to work at the physical location of the business, there was no showing that appellant's property interest in the business depends on his physical presence; that the tasks he performs on site at the restaurant cannot be performed economically

by others; and that other tasks he performs cannot be handled with comparable economic efficiency at a site outside any buffer zone.[8] Appellant provided no evidence to quantify his claim that the restaurant had "suffered" as a result of his physical absence; rather, his testimony regarding the restaurant's lack of profit centered on the start-up difficulties routinely involved in launching such a business.

Thus, although OCGA § 42-1-15 (b) (1) has the functional effect of ousting appellant physically from his business, appellant has not shown that the regulation has unduly burdened him financially or adversely affected his reasonable investment-backed expectations in his business. We therefore conclude that appellant failed to establish that the economic impact of the work restriction, as applied to him, effected an unconstitutional taking of appellant's property interest in his business. The trial court did not err by denying appellant's request for declaratory relief.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Sears, C. J., and Melton, J., who concur specially.*

SEARS, Chief Justice, concurring specially.

Given the evidence before the trial court, I concur that Mann failed to show a sufficient level of interference with his property rights to justify a finding of a regulatory taking of his business property. The Court is therefore correct to uphold the trial court's judgment denying Mann's claim as it relates to his business. In rejecting this claim, the majority opines, correctly, that the phrase "employed by" in OCGA § 42-1-15 (b) (1) cannot, as a matter of statutory construction, be interpreted to prohibit mere ownership of a business within the 1,000-foot zone. However, the Court's formulation of what the statute prohibits business owners from doing — i.e., that it bars any business ownership that requires the sex offender's "physical presence" at the business or entity, presumably no matter how infrequent or short in duration — is too broad, since the statute is clear that it only bars owners from being "employed" (either full- or part-time) at a location within the prohibited zone.

I am authorized to state that Justice Melton joins in this special concurrence.

DECIDED NOVEMBER 21, 2007 —
RECONSIDERATION DENIED DECEMBER 13, 2007.

---

[8] Appellant's testimony regarding the difficulties in establishing a restaurant at a particular location was sufficient to show the significant adverse economic impact that would result if the restaurant had to be relocated once the lease term expired.

*Albert B. Wallace, Stephen B. Wallace II*, for appellant.

*Thurbert E. Baker, Attorney General, Joseph J. Drolet, Senior Assistant Attorney General, Michael L. Smith, James E. Dearing, Jr., R. Lynn Wood*, for appellees.