MOORE, Circuit Judge,
with whom RADER and SCHALL, Circuit Judges, join, concurring.
I concur in the decision of the court not to rehear this case en banc. This case, as it was presented to us in this appeal, is one in which a physical, not a regulatory, taking analysis ought to apply. For the purposes of the summary judgment ruling on appeal, the government conceded (1) that Casitas had a property right in the water diverted from the Ventura River, and (2) that the government required Casi-tas to build and operate the fish ladder in such a way as to permanently appropriate water in which Casitas had the conceded property right. To the extent that the facts may be in dispute, Casitas’ version of the facts must be taken as true because the government was the moving party. In view of these facts, it is clear that the government has not merely burdened, impounded, restricted in use, temporarily impaired, or otherwise regulated Casitas’ water. Rather, it has appropriated it, and where, as here, the government action is “the functional equivalent of a practical ouster of the owner’s possession,” a physical takings analysis is appropriate. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).
For purposes of the decision below, and this appeal, the government conceded that Casitas’ right to divert annually 107,800 acre-feet of water is part of its property right. Def.’s Reply Supp. Mot. Partial Summ. J. at 3-4 (“Plaintiff [characterizes its property interest] in its opposition brief [as follows]: ‘In this case, Casitas claims the right to divert through the Ventura River Project 107,800 acre-feet of water from the Ventura River per year and the right to put 28,500 acre-feet of water to beneficial use each year....’ [I]n order to streamline this summary judgment process, and to avoid any unnecessary confusion in the resolution of the nature or type of taking at issue in this case (i.e., physical or regulatory) defendant will assume for purposes of this motion that plaintiffs characterization of the scope of its property interests is correct.”).[1] Casitas diverts its water from behind the Robles Diversion Dam in the Ventura River and into the Robles-Casitas Canal, where it then flows to Lake Casitas.
Furthermore, for the purposes of the decision below, and this appeal, the government conceded that it required Casitas to comply with the biological opinion. Ap-pellee’s Brief at 22 n. 6 (“Reclamation never required Casitas to install the fish ladder or comply with the operating criteria in the BiOp. For the purposes of this appeal from the CFC’s summary judgment rulings, however, the United States assumes at this stage of the proceedings that Casitas’ factual allegation [that Casitas indeed was required to build the fish ladder and comply with the BiOp] is correct.”). The biological opinion describes diverting water to create flow through the fish ladder. Of course, the fish ladder cannot become operational as required by the biological opinion unless it is provided with water. That water, as the government admitted in oral argument, comes out of *1332 the Casitas-Robles Canal. Oral Argument at 30:28-31:30, referencing id. at 5:20-6:35, 10:10-10:57. In other words, the water for the fish ladder comes out of Casitas’ allotment of 107,800 acre-feet per year. That is so because, once the water is in the canal, it is water that Casitas has diverted pursuant to its allotment. It thus has become the property of Casitas. The operation of the fish ladder diversion works thus takes property of Casitas. The government does not explain how the fish ladder can be operated if water is merely left in the Ventura River. Nor does it explain how the fish ladder could be operated with then-existing water flows. Nor is there a distinction between some water that must remain in the Ventura River and the water needed for the fish ladder. Ca-sitas’ explanation of the pertinent facts was clear and undisputed, and regardless, ought to be taken as true because the government was the moving party in the summary judgment motion now on appeal.
In light of the aforementioned facts, it is readily apparent that the government “t[ook] property from A and g[ave] it to B.” Eastern Enters. v. Apfel, 524 U.S. 498, 523, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (citing Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 388, 1 L.Ed. 648 (1798)). The dissent analogizes the situation in Casitas to that in Pennsylvania Coal v. Mahon, where the Court held that a statute restricting the mining of coal constituted a regulatory taking. 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Mahon does not control this case because in Mahon, the government did not physically appropriate the coal. Rather, it preserved the status quo by leaving the coal in the ground.[2] As the Court explained in Lingle v. Chevron U.S.A. Inc., a physical takings analysis is appropriate where there is “direct government appropriation or physical invasion of private property.” 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (further explaining that physical takings analysis is appropriate where the government action is the “functional equivalent of a practical ouster of the owner’s possession”). In Casitas, the government changed the status quo by irrevocably appropriating Casitas’ water and sending it down the fish ladder where Casitas could not recover it.
The dissent also relies on Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Tahoe-Sierra concerns a taking claim arising from the application of a temporary moratorium on land development. The Court held that such a temporary moratorium did not constitute a per se taking because “[ljogically, a fee simple estate cannot be rendered valueless by a temporary prohibition on *1333 economic use, because the property will recover value as soon as the prohibition is lifted.” Id. at 331-32, 122 S.Ct. 1465. Tahoe-Sierra does not answer the questions posed by this case. It did not involve a physical taking claim, and it did not address or purport to cut back on the Court’s water rights cases. In Tahoe-Sierra, the temporary moratorium at issue preserved the status quo for 32 months, and then returned the land to its owner. In our case, the government diverts the water out of the Robles-Casitas Canal and sends it down the fish ladder to the Ventura River below the Robles Dam. That water will never flow to Lake Casitas, and it is permanently taken from Casitas.
The dissent further relies on Boise Cascade Corp. v. United States, 296 F.3d 1339, 1354 (Fed.Cir.2002). I do not disagree that “[t]he governmental protection of owls in Boise Cascade ... is not comparable to a governmental authorization to third parties to utilize property.” Seiber v. United States 364 F.3d 1356, 1367 (Fed.Cir.2004). But the taking claim in Boise Cascade arose from a district court’s injunction, requiring that no logging take place without a permit, issued after a juvenile spotted owl was discovered on Boise’s land. We held, inter alia, that the mere imposition of a permitting requirement did not give rise to a physical taking under Loretto because “[t]he government simply imposed a temporary restriction on Boise’s exploitation of certain natural resources located on its land unless Boise obtained a permit.” As with Tahoe-Sierra, Boise Cascade does not aid our decision in this case because it concerns a temporary restriction that preserves the status quo and permanently takes nothing away from the property owner.
Finally, the dissent analogizes this case to previous ones treating “the prohibition of surface mining as a potential regulatory taking.” In Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed.Cir.2005) and Rith Energy, Inc. v. United States, 247 F.3d 1355, 1364 (Fed.Cir.2001), the takings claims arose from government orders restricting mining operations. In neither of those cases did the government commandeer any coal for public use. This is in contrast to our situation, where the government diverted water away from Casitas for public use, and Casitas could never recapture that water.
Respectfully, we did offer a reason for treating Casitas’ water differently than the coal, trees, and other property involved in the regulatory takings cases cited by the dissent. The Supreme Court has repeatedly found water diversions to be physical takings. International Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931); United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In each of these cases, the United States physically diverted the water, or caused water to be diverted away from the plaintiffs’ property. In each of these cases the diverted water was dedicated to government use or third party use which served a public purpose. Under the facts of this case as configured on appeal, we are compelled to reach the same conclusion.

. Because of the government’s concession, the majority did not undertake to decide if, under California Law, there can be a right to divert water. Nor did we undertake to reach a factual conclusion about whether Casitas will experience a reduction in the amount of water that it can beneficially use. These concerns and others are undoubtedly critical to the ultimate outcome of Casitas’ action, but they are not before us in this appeal.

. Furthermore, the Court in Mahon was not presented with the issue of whether a taking was a physical or regulatory taking, nor was the Court presented with the issue of water diversion. The dispute in Mahon was whether the Kohler Act represented an exercise of eminent domain at all, or rather an uncom-pensable exercise of the police power. See e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 481-84, 107 S.Ct. 1232, 94 L.Ed.2d 472 (explaining Mahon). Mahon is not an apt guide for distinguishing regulatory takings and physical takings bearing on water rights. To the extent that a factual analogy between this case and Mahon is relevant, consider that the Kohler Act did not necessarily require Pennsylvania Coal to “leave in place a pillar of coal to prop up the surface land” as the dissent asserts. “The statute forbids the mining of anthracite coal in such way as to cause the subsidence of, among other things, any structure used as a human habitation.” Mahon, 260 U.S. at 412-13, 43 S.Ct. 158. Counsel for Pennsylvania pointed out that "[t]he act does not go as far as the Barrier Pillar Act. It contains no provision requiring any mine owner to leave coal in place. If natural support other than coal in the pillars be available, or if artificial support be provided, every pound of coal may be removed from the mines.” Id. at 404-11, 43 S.Ct. 158.