# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3815

_____

| | | |
|---|---|---|
| Iowa Assurance Corporation; Ron's Automotive, LC; Ronald L. Inman, III; Vinton Philip Watson; Judith Ann Watson, | * * * * * | |
| | * | Appeal from the United States |
| | * | District Court for the |
| Plaintiffs - Appellants, | * | Southern District of Iowa. |
| | * | |
| v. | * | |
| | * | |
| City of Indianola, Iowa; Bob Kreamer; Randy Gathers; Shirley Clark; Pete Berry; Steve Richardson; Mark Victory, | * * * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: June 15, 2011
Filed: August 16, 2011

_____

Before BYE and MELLOY, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

MELLOY, Circuit Judge.

The City of Indianola ("City") adopted a land-use ordinance requiring the enclosure of "figure eight cars," among other racing vehicles, when two or more such

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

cars are present. Iowa Assurance Corporation and its co-plaintiffs (collectively referred to as "Watson") sued the City, arguing that the ordinance creates an uncompensated regulatory taking in violation of the Fifth and Fourteenth Amendments. After a bench trial, the district court[2] rejected Watson's claim, and Watson appeals. We affirm.

I.

Vinton Watson began racing figure eight cars in and around Indianola, Iowa, in 1999. Since that time, his passion for racing has grown to the point where he now owns seven to eight cars at any one time. He also races frequently, participating in races most weekends from April through early October. When Watson began racing in 1999, he typically stored and maintained his cars at his residence in Indianola. However, after developing a driveway and garage "full of race cars," Watson decided in March of 2006 to lease a shop and adjacent parking lot from Ron Inman for $300 per month on a month-to-month basis.

Inman's property is located in Indianola on real estate zoned for commercial use. Permissible uses of the property include "automotive display, sales, service and repair," "personal services and repair shops," and "service, repair and rental of trucks [and] trailers." The shop that Watson leases consists of half of one building and amounts to "a little over 900 square feet." The parking lot included in the lease is located immediately adjacent of the building and is twenty-seven by thirty-four-feet. Watson can store up to three cars in the shop, although it is difficult to store more than two cars when repairing vehicles inside the shop. Additionally, Watson stores up to three cars in the parking lot, although cars are not always stored there.

---

[2]The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa, to whom the case was referred by consent of the parties pursuant to 28 U.S.C. § 636(c).

Watson's use of the property to repair and store race cars has annoyed at least some Indianola residents, who have complained to the City on numerous occasions. The complaints often focused on the appearance and noise of Watson's race cars. In response, on November 5, 2007, the City passed an ordinance requiring figure eight cars, among other race cars, to be enclosed by a fence in all outdoor areas where two or more vehicles are present. The City subsequently informed Watson that "a municipal infraction [would] be filed against those parties in noncompliance after December 4th, 2007."

On November 30, 2007, Watson sued the City and members of the Indianola City Council in state court, alleging in part that the ordinance violated the Takings Clause of the Fifth Amendment as incorporated through the Fourteenth Amendment. Watson specifically alleged that the ordinance creates an uncompensated regulatory taking by requiring him to install a fence in order to continue using the property to store race cars and by reducing the overall value of the property. The City subsequently removed the case to federal court, where in January of 2009, the district court questioned whether the City had followed proper procedures in enacting the ordinance.

In response, on June 1, 2009, the City passed a new version of the ordinance, which was essentially identical to the previous version except for one provision that clarified the height and type of fencing required. The new ordinance, entitled Ordinance 1432, specifically mandated that the fence be "double-faced opaque wooden or masonry fence or slatted chain link fence, all with the minimum height of six feet (6') above ground." Watson filed a supplemental complaint, alleging that the new ordinance violated the Constitution in the same manner as the previous ordinance.

On January 27, 2010, the district court held a bench trial, after which it issued a decision in favor of the City. In analyzing Watson's takings claim, the district court applied the takings standard from Penn Central Transportation Co. v. City of New

York, 438 U.S. 104 (1978). According to the court, Penn Central required the court to consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the government regulation." Additionally, the court stated that it "is appropriate here to specifically examine the nature and extent of [Ordinance 1432's] interference with the use of the leased property."

In its application of the first factor, the court found that erection of a fence would not be particularly expensive and that any diminution in value to the leased property the fence may cause could be eliminated by removing the fence at low cost.[3] Applying the second factor, the court found that there was "no evidence of significant investment" in the property in reliance on the City's zoning scheme prior to Ordinance 1432. Applying the third factor, the court noted that Ordinance 1432 did not cause a "physical invasion" of Watson's property and that the City had passed the ordinance for a legitimate public purpose, namely the promotion of "community aesthetics." Finally, the court found that Watson "would be able to keep the same number of race cars outdoors on his leased property" if he erected a gated fence. Accordingly, with all of the factors weighing against Watson, the district court found no constitutional taking. Watson appeals.

II.

On appeal, Watson argues that the district court erred in using the Penn Central framework to analyze his takings claim. Watson does not challenge any of the district court's factual findings or even its application of the Penn Central test, but asserts that

---

[3]The parties agreed that erection of a fence would cost at least $2,880, and if a gated fence were erected, then Watson would need to spend at least an additional $2,000 to "cut" the curb to allow access to the gated fence from the adjacent street. Additionally, Watson acknowledges any reduction in value of the property due to the existence of the fence could be restored by removing the fence for roughly $1,000.

-4-

the district court should have found an unconstitutional taking under an alternative regulatory taking test that courts apply to physical invasions of private property. He specifically analogizes his case to the Supreme Court's seminal decision in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982). In the alternative, Watson maintains that the district court should have found an uncompensated taking under the test the Supreme Court developed for land-use exactions in Nollan v. California Coastal Commission, 483 U.S. 825 (1987), and Dolan v. City of Tigard, 512 U.S. 374 (1994). For the following reasons, we disagree.[4]

After a bench trial, we review the district court findings of fact for clear error and its legal conclusions de novo, including the determination of which takings analysis to apply to a challenged regulation. Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 436 (8th Cir. 2007). "The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not be taken for public use, without just compensation." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005) (internal quotation marks and citation omitted). The government takes property for purposes of the Fifth Amendment when it literally ousts an owner from his property or when its regulation of the property is "so onerous that its effect is tantamount to a direct appropriation or ouster." Id. at 537.

The non-ouster takings are called "regulatory takings," and regulatory takings come in four types. Id. The first type is a regulation which "requires an owner to

---

[4]In his brief, Watson also argues that Ordinance 1432 constitutes a taking of his money because the ordinance requires him to build a fence using his own funds. We do not find this argument persuasive because, as discussed below, Watson can choose to forgo building a fence by storing fewer than two race cars on his property. This choice generally negates the required acquiescence necessary to establish a claim for a taking of money. See Brown v. Legal Found. of Wash., 538 U.S. 216, 232–35 (2003); Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160–63 (1980).

-5-

suffer a permanent physical invasion of her property." Id. at 538 (citing Loretto, 458 U.S. at 419). The second type is a regulation that "completely deprive[s] an owner of all economically beneficial use of her property." Lingle, 544 U.S. at 538 (internal quotation marks omitted) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992)). The third type is a governmental requirement that, without sufficient justification, requires an owner to "dedicate" a portion of his property in exchange for a building permit. Lingle, 544 U.S. at 546–48 (citing Nollan, 483 U.S. at 825). The fourth type is any other regulation which, after considering its economic impact upon the plaintiff and its essential character, is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 538–39 (citing Penn Central). At issue here are the first and third types of regulatory takings: physical invasions and land-use exactions.

A.

Watson argues that the district court erred by failing to find that the ordinance constituted a physical invasion type regulatory taking under Loretto. In Loretto, an apartment owner challenged a New York law requiring her to allow the installation of cable-television equipment upon her property. 458 U.S. at 421–23. Pursuant to this law, a cable-television provider had entered the owner's property and installed a roughly thirty-four foot, one-half-inch-diameter cable about eighteen inches above the roof of the owner's apartment. Id. at 422. The cables were attached to the property with screws and nails that penetrated the building's masonry about every two feet. Id. The Court concluded that the New York law resulted in a taking of the owner's property because it authorized a "permanent physical occupation of property." Id. at 434–35. The fact that the law might have "achieve[d] an important public benefit or [had] only minimal economic impact on the owner" was irrelevant. Id.

In this case, the district court correctly determined that Ordinance 1432 should not be analyzed under the standards of Loretto. By its own terms, the ordinance does

not require Watson to permit either the City or any third party to enter the property and install a fence. Consequently, the ordinance does not erode Watson's right to exclude others from the property, which is central to establishing a Loretto claim. Id. at 435 (noting that the New York law requiring landlords to allow cable providers to install equipment on their property curtailed landlords' right to exclude—"one of the most treasured strands in an owner's bundle of property rights"); see also Lingle, 544 U.S. at 539 (noting that a Loretto regulatory taking "eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests"). Watson attempts to avoid this conclusion by arguing that he is compelled to permit a physical intrusion because he must install a fence in order to continue storing race cars on his property. However, Watson is not required to continue storing vehicles on his property, and so long as he still may choose whether to build the fence or forgo placing more than one vehicle outside, he cannot establish the required compliance necessary for a Loretto claim. See Yee v. City of Escondido, 503 U.S. 519, 527 (1992); FCC v. Fla. Power Corp., 480 U.S. 245, 252 (1987) (discussing Loretto and noting that "[t]his element of required acquiescence is at the heart of" a Loretto regulatory taking).

## B.

Watson also argues that the district court erred in failing to find a taking under Nollan because the ordinance is effectively conditioning the use of the property as a

place to store race cars upon building a fence.[5] This argument is meritless. <u>Nollan</u> only applies to "land-use exactions—specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit," or presumably obtaining other governmental benefits or licenses. <u>Lingle</u>, 544 U.S. at 546–47 (noting that <u>Dolan</u>, 512 U.S. at 379–80, is also limited to the context of land-use exactions). Land-use exactions, like <u>Loretto</u> takings, restrict owners' right to exclude others from their property. <u>Lingle</u>, 544 U.S. at 539. In this case, however, Ordinance 1432 does not require Watson to dedicate any portion of his property to either the City's or the public's use. Moreover, as explained above, the ordinance does not materially affect Watson's right to exclude others. Accordingly, the district court correctly concluded that the takings test articulated in <u>Nollan</u> did not apply to the ordinance.

## III.

For the foregoing reasons, we affirm the well-reasoned judgment of the district court in its entirety.

_____

---

[5]In making his argument under <u>Nollan</u>, Watson suggests that Ordinance 1432 constitutes a taking because it does not provide a sufficient amortization period to effect the change or allow for a continued non-conforming use exemption. To the extent that Watson has properly raised this issue on appeal, we reject it for the reasons stated by the district court.