# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3367

_____

William Becker; Darcy Lynch, co-trustees of the Antoinette Ogilvy Trust under the will of George Ogilvy

*Plaintiffs - Appellants*

v.

City of Hillsboro, Missouri

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 25, 2024
Filed: January 7, 2025

_____

Before COLLOTON, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

The City of Hillsboro adopted land-use ordinances prohibiting new private wells within City limits and prohibiting the use or construction of residences in the City unless those residences are connected to the City water system. A local landowner sued the City, arguing that the ordinances create an uncompensated regulatory taking in violation of the Fifth and Fourteenth Amendments. The district

court[1] granted summary judgment to the City, rejecting the landowner's claims, and the landowner now appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

This case centers around a 156-acre[2] tract of land in Jefferson County, Missouri. The Property is owned by the Antoinette Ogilvy Trust. Appellants, siblings William Becker and Darcy Lynch, are co-trustees of the Trust.

The Property currently sits within but at the edge of the City of Hillsboro, Missouri, but it has not always been a part of Hillsboro. In 2000, the Property was voluntarily annexed into Hillsboro and zoned for residential use. Both of the relevant annexation documents stated that the City "has the ability to furnish normal municipal services to the area" (or a similar variation). The documents said nothing about paying to connect those services.

As a part of the City of Hillsboro, the Property is subject to two key Hillsboro regulations. The first was enacted in 1971, nearly three decades before the Trust annexed the Property to Hillsboro. That regulation prohibits new private wells in City limits. The second regulation was enacted in 2008, eight years after the voluntary annexation. That regulation makes it unlawful to "occupy, use[,] or otherwise live in" any residential structure "which is not being serviced by the [C]ity water supply system or by an approved and functioning deep well."

---

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

[2]The Property was originally 176 acres but the owners sold about 20 acres of it in 2021. The remaining 156 acres are at issue here.

In 2020, after years of allowing the property to sit vacant, the trustees[3] tried to sell the Property. Becker stated that the initial attempts to sell the Property as a single tract failed. Upon the recommendation of their real estate agent, the trustees began marketing the Property in eight smaller lots instead. In 2021, the Trust sold one of the lots to Josh and Julia Brown for $233,825, a price Becker claims was based on the mistaken assumption by both the buyer and the seller that the Browns would be able to drill a private well.

It was around that time that Becker claims the trustees first became aware of the annexation and the applicable regulations. As the trustees further investigated the effect of these regulations, they learned that the cost to extend the City water system to the eight tracts of land would be substantial. In fact, per an expert appraisal report the trustees requested, the estimated cost to connect water to all the proposed lots is between $963,000 and $1,578,000,[4] making development of the property "not financially feasible." The trustees claim that these water connection expenses have deterred additional buyers from moving forward with purchasing some of the tracts the trustees seek to sell.

The City water lines currently run to a spot about 228 feet away from the Property. The City asserts it is willing and able to run water from that spot to within 20 feet of the trustees' property line—at the trustees' cost—enabling the trustees to tap into the City's water supply.[5] This is the same process the neighboring Eagle

---

[3]Becker and Lynch became the trustees in 2021, when their mother died.

[4]There is a mismatch between the amount the expert report lists and the amount the trustees admit to in summary judgment documents. The expert report lists $1,578,000, while the trustees state the estimated cost is $1,575,000.

[5]The trustees question the City's ability to extend the water line, noting City representatives testified that such an extension would require the City to obtain easements either by agreement or by eminent domain. The trustees further highlight testimony from a City representative noting that engineers might have to "figure out" some "residual pressure" issues in connecting the water line. Even if both these

Ridge Subdivision went through when developing, though Eagle Ridge had to pay to extend the water about 3,000 feet, a City representative testified. The trustees have not asked the City to run water to their property.

In 2022, the trustees sued the City of Hillsboro, alleging the City's regulations constituted takings in violation of the Missouri Constitution[6] and the United States Constitution and violated their Constitutional rights under 42 U.S.C. § 1983. They sought damages for inverse condemnation and violation of constitutional rights under § 1983. The § 1983 claim was resolved on a motion to dismiss. Both sides moved for summary judgment on the taking claims.

The trustees moved for summary judgment first. They asserted that the City's regulations constitute a taking in three ways. First, they argued that the City's regulations constitute an effective permanent physical invasion of their property. Second, they asserted that the regulations effectively deny them all economically viable use of their property. If established, either of these first two types of takings would be a *per se* taking, meaning the court would not need to consider any mitigating factors to issue a decision in favor of the landowners. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-39 (2005) (noting that *per se* regulatory takings are the only type of regulatory takings not governed by Penn Central). Finally, the trustees claimed that the regulations are a taking under the Supreme Court's balancing test for regulatory takings (the Penn Central test). See Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978).

---

statements are true, they only indicate that the City has not yet worked through the logistics of extending the water; they do not negate the City's assertion that it is able to extend the water line if the trustees request.

[6]Missouri courts analyze Missouri takings claims under the same framework provided by the Supreme Court for Fifth Amendment takings. See Clay Cnty. ex rel. Cnty. Comm'n of Clay Cnty. v. Harley & Susie Bogue, Inc., 988 S.W.2d 102, 107 (Mo. Ct. App. 1999) ("Missouri considers the same factors the Supreme Court has considered in making a determination of whether a taking has occurred under . . . the Missouri Constitution.").

A few weeks later, the City filed a motion for summary judgment as well. In its memorandum in support of its motion, the City argued that the Penn Central test governs and that its regulations do not constitute a taking because they pass that test. A few days later, in a separate filing responding to the trustees' motion, the City further asserted that its regulations do not constitute a physical invasion of the trustees' property because the regulations do not require an actual occupation of the property. The City also argued that the regulations do not deprive the Property of all economically viable use, but instead merely required the developers to pay costs associated with developing the property.

The district court denied the trustees' motion and granted the City's motion for summary judgment. The court first rejected both of the trustees' *per se* taking claims, noting that the regulations do not involve or require any kind of physical encroachment onto the trustees' property and—by the trustees' expert's own admission—do not deprive the Property of *all* economic value. The Court then determined that no reasonable factfinder could conclude a taking exists under the Supreme Court's balancing test for regulatory takings.

## II.

We review a grant of summary judgment de novo. Se. Ark. Hospice, Inc. v. Burwell, 815 F.3d 448, 450 (8th Cir. 2016). "Summary judgment is appropriate if there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." Huynh v. Dep't of Transp., 794 F.3d 952, 958 (8th Cir. 2015). In other words, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989). We view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. Corkrean v. Drake Univ., 55 F.4th 623, 630 (8th Cir. 2022).

The Fifth Amendment, as applied to the States through the Fourteenth Amendment, "provides that private property shall not be taken for public use, without just compensation." Iowa Assur. Corp. v. City of Indianola, 650 F.3d 1094, 1097 (8th Cir. 2011) (quoting Lingle, 544 U.S. at 536). The purpose of the Takings Clause is "to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 617-18 (2001) (citation omitted).

For decades, the Takings Clause was generally understood only to apply to "direct appropriation[s]" of property, or "the functional equivalent of a 'practical ouster of [the owner's] possession.'" Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992) (second alteration in original) (first quoting Legal Tender Cases, 79 U.S. (12 Wall.) 457, 551 (1871); then quoting N. Transp. Co. v. City of Chicago, 99 U.S. 635, 642 (1879)). That all changed in 1922 when the Supreme Court issued its decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922). See Lucas, 505 U.S. at 1014.

Mahon established the "general rule" that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415. Though recognizing that "[g]overnment hardly could go on" if regulations are easily characterized as takings, the Court in Mahon noted that when the diminution in value "reaches a certain magnitude," the Fifth Amendment requires the government to compensate the property owner for his loss. Id. at 413.

Fifty years later, the Supreme Court laid out what would become the default test for determining whether a regulation constitutes a taking. See Penn Central, 438 U.S. at 130-31. The Penn Central Court crafted a test that focuses largely "upon the particular circumstances [in each] case." Id. at 124 (citation omitted). Under the Penn Central balancing test, courts consider: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." Id.

Furthermore, certain types of regulatory actions are *per se* regulatory takings—meaning they are not subject to the Penn Central test. See Lingle, 544 U.S. at 538. There are thus "four types" of regulatory takings. City of Indianola, 650 F.3d at 1097; see also Lingle, 544 U.S. at 538-39, 546-48. First, there are regulations which "require[] an owner to suffer a permanent physical invasion of her property." City of Indianola, 650 F.3d at 1097 (citation omitted). These were first identified in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982). See id. Second, there are regulations that "completely deprive[] an owner of all economically beneficial use of her property." Id. (citation omitted). This type of taking was identified in Lucas, 505 U.S at 1019. See id. Third, there are "government requirement[s] that, without sufficient justification, require[] an owner to 'dedicate' a portion of his property in exchange for a building permit." Id. These are known as "exactions." See id. at 1097-98. Finally, there are all other regulations which fail the Penn Central balancing test. See id.

The trustees allege that the City's regulations constitute all four types of taking. We analyze each in turn.

A.

The trustees first argue that the City's regulations mandate a permanent physical invasion of the property.

A regulation that "requires an owner to suffer a permanent physical invasion of her property" is a taking. Id. at 1097 (citing Loretto, 458 U.S. at 419). In Loretto, a New York apartment owner challenged a state law which required her to permit a cable television company to install cable facilities on her property. 458 U.S. at 421. The cable, which was slightly less than one-half inch in diameter, occupied portions of her roof and the side of her building. Id. at 422. The Supreme Court determined that such a "permanent physical occupation authorized by government is a taking." Id. at 426.

This rule is limited to "permanent physical occupations"—that is, regulations that do not "simply take a single 'strand' from the 'bundle' of property rights," but rather "chop[] through the bundle, taking a slice of every strand." Id. at 435, 441. Loretto's "very narrow" holding did not "question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property." Id. at 441.

In this case, the district court correctly determined that the regulations at issue do not involve a permanent physical invasion of the property. The applicable ordinance requires all residential structures in the City to be "serviced by the city water supply system or an approved and functioning deep well," but do not require the trustees to dedicate to the City either the water lines themselves or the land on which they sit.[7] Nor do the trustees point to any regulation obligating the landowners to build any residential structures. Unlike in Loretto, in which the apartment owner was forbidden from interfering with the installation of the cable on her property, here the trustees may prohibit anyone from entering their property by choosing not to build residential structures on their property. See 458 U.S. at 423, 426. The regulation is thus the type of "appropriate restriction[] upon an owner's *use* of his property" that the Loretto Court did not question. See id. at 441.

---

[7]The trustees assert without citation that the regulations require "a *permanent dedication of those improvements and the land* on which they sit to the City." Appellants' Br. 22. This assertion appears to be based on the City's alleged history of conditioning development on a dedication of utility easements. See Appellants' Br. 7. However, the trustees have not established that there is an affirmative obligation on them to dedicate the improvements, the land, or any easements to the City absent development. Because the trustees have not supported their position with evidence, they are unable to overcome summary judgment on this issue. See Bedford v. Doe, 880 F.3d 993, 996 (8th Cir. 2018) (noting that "the burden on the movant 'may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case'") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

The trustees are not being compelled to tolerate a permanent physical occupation because they are not being compelled to do anything at all. This case is similar to City of Indianola. In that case, this Court held that an ordinance requiring certain vehicles to be enclosed by a fence in all outdoor areas was not a taking under Loretto because "[b]y its own terms, the ordinance does not require [the landowner] to permit either the City or any third party to enter the property and install a fence." City of Indianola, 650 F.3d at 1098. So long as the landowner "still may choose whether to build the fence or forgo placing more than one vehicle outside, he cannot establish the required compliance necessary for a Loretto claim." Id. So too here, the trustees still may choose whether to build a structure and comply with the ordinance or forgo building a structure. The trustees argue that this case is distinguishable from City of Indianola because absent compliance here, they "cannot make *any use* of their Property, other than leaving it vacant and idle." But the trustees point to no case law in support of this position, and their purported factual distinction is not supported by the record; the trustees may still use the Property as is for recreational purposes, or they could sell it. To the extent the trustees argue that their inability to use the Property without succumbing to the City regulations deprives them of all use of the Property, that argument is resolved in Part II.B, *infra*.

Because the trustees have not established that the regulations require them to suffer "a permanent physical invasion," they have not established a *per se* regulatory taking under Loretto. See id. at 1097.

B.

The trustees next argue that the regulations constitute takings because they deprive the trustees of all economically beneficial use of their property.

The Supreme Court has established that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas, 505 U.S. at 1019. Thus in Lucas, in which the trial court determined

that the Act "deprive[d] [the landowner] of any reasonable economic use of the lots," rendering them "valueless," the Supreme Court found a compensable taking. Id. at 1009, 1027 (first alteration in original) (citation omitted).

But a landowner cannot succeed on a Lucas claim if the landowner's property still has substantial value following the regulation. See Palazzolo, 533 U.S. at 616. "Diminution in property value, standing alone," does not establish a taking. Penn Central, 438 U.S. at 131. In Palazzolo, the landowner sought to develop his waterfront parcel, but his plans were rejected due to wetland regulations. 533 U.S. at 611. The landowner argued that the regulations diminished his property value such that he was left with only "a few crumbs of value," thus constituting a regulatory taking under Lucas. Id. at 631 (citation omitted). The property was worth roughly $3.15 million (according to the landowner's own calculations) at the time it was taken and retained only $200,000 in development value under the State's wetlands regulations. Id. at 616, 630-31. But despite the significant reduction in value, the Supreme Court rejected the landowner's takings argument, noting that the regulations still permitted the landowner to build a substantial residence on an 18-acre parcel of the land and thus did not leave his property "economically idle." Id. at 631 (citation omitted). The alleged taking was not compensable because the landowner was left with more than a "token interest." See id.

Here, the district court correctly rejected the trustees' claim of a taking under Lucas. Unlike the regulations in Lucas, the regulations in this case do not bar the trustees from erecting any permanent habitable structures; they merely impose water-system requirements on those who choose to erect structures in the City. Even the trustees' own expert did not suggest that the property was rendered valueless by the City's ordinances. Rather, the trustees asserted that the effect of the ordinances "reduced the Property's value from $1,550,000 to $477,000, or about 70%." Appellants' Br. 26. This is both a greater residual value than in Palazzolo—$477,000 here compared to $200,000 in Palazzolo—and a smaller percentage decrease than in Palazzolo—roughly 70% here compared to nearly 94% in Palazzolo. Thus, even accepting the numbers the trustees relied on without

-10-

citation in their brief, the trustees' property here has not been deprived of all economic value and does not constitute a regulatory taking under <u>Lucas</u> and <u>Palazzolo</u>. The trustees' argument that <u>Palazzolo</u> is distinguishable because that landowner could still develop a portion of its property is unavailing; here, the trustees can develop *all* of their property so long as they comply with the regulation. As the Supreme Court has recognized, "the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." <u>Lucas</u>, 505 U.S. at 1027. It is only when those regulations eliminate *all* economically valuable use that <u>Lucas</u> requires compensation, and the trustees have failed to establish that Hillsboro's regulations render their property valueless.

C.

Third, the trustees argue that the City's regulations amount to an impermissible exaction.

Exactions are "land-use decisions conditioning approval of development on the dedication of property to public use." <u>City of Monterey v. Del Monte Dunes at Monterey, Ltd.</u>, 526 U.S. 687, 702 (1999). Such conditions are impermissible unless they satisfy a two-pronged test. <u>See</u> <u>Sheetz v. Cnty. of El Dorado</u>, 601 U.S. 267, 275 (2024). First, there must be an "essential nexus" between the permit condition and a legitimate state interest. <u>Nollan v. Cal. Coastal Comm'n</u>, 483 U.S. 825, 837 (1987). Second, there must be "rough proportionality" between the condition and the projected impact of the proposed development. <u>Dolan v. City of Tigard</u>, 512 U.S. 374, 391 (1994). The trustees claim that the City's ordinance fails both prongs, constituting a taking under exaction analysis.

This Court declines to reach this issue because, as the district court correctly determined, the trustees did not sufficiently raise the issue below. In its memorandum in support of its motion for summary judgment, the trustees noted that

the City might argue its regulations imposed a "reasonable condition." To this point, the trustees stated:

> This contention is mistaken for several reasons. First, the Trust is not seeking any permits from the City, but rather merely to sell the Property for potential development by others. Second, even if construed as the Trust indirectly seeking building permits for future purchasers of the Property, the imposition of this alleged "condition" fails to meet . . . [Dolan and Nollan]. . . . In this case, the exaction of $500,000 plus the dedication of land for the purpose of extending the City's water system is (1) totally unrelated to any impact . . . and (2) totally disproportionate to any such impact . . . .

The trustees claim this proves they raised the exaction claim because they used the phrase "exaction" and cited both Nollan and Dolan. But those references and citations were made in the context of arguing that the regulations are *not* impermissible exactions because the Trust is not seeking permits from the City. Furthermore, the trustees made no reference to exactions, Nollan, or Dolan in their Amended Complaint. It is well-settled that "[a] party may not assert new arguments on appeal of a motion for summary judgment." O.R.S. Distilling Co. v. Brown-Forman Corp., 972 F.2d 924, 926 (8th Cir. 1992); see also N. Bottling Co., Inc. v. Pepsico, Inc., 5 F.4th 917, 922 (8th Cir. 2021) ("[A] party's failure to raise an argument before a trial court typically waives that argument on appeal."). Because the trustees failed to raise the exactions argument to the district court, we decline to consider it on appeal.

D.

Lastly, the trustees argue that there are enough factual disputes[8] to warrant a jury trial on whether the regulations constitute a taking under Penn Central.

---

[8]In their summary judgment filings, the trustees asserted that the regulations constitute a taking under Penn Central as a matter of law; they did not argue that the case should go to trial because of factual disputes. However, the trustees did maintain there were several disputes of fact.

-12-

Under Penn Central, courts consider three factors to determine whether a regulatory scheme constitutes a compensable taking: (1) the regulation's economic impact, (2) the interference of the regulation with investment-backed expectations, and (3) the character of the government action. See Heights Apartments, LLC v. Walz, 30 F.4th 720, 734 (8th Cir. 2022) (citing Penn Central, 438 U.S. at 124). Courts give "primary" consideration to the first two factors while considering the third factor as potentially "relevant in [discerning] whether a taking has occurred." Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 441-42 (8th Cir. 2007) (quoting Lingle, 544 U.S. at 538-39).

1.

As a preliminary matter, the parties here dispute how to characterize the property under Penn Central. The trustees seek to apply the Penn Central factors based on the cost to hook up City water to eight different subdivided lots within the parcel, as that's how they hope to sell the tract. In other words, the trustees attempt to characterize the parcel as eight separate lots for purposes of Penn Central analysis. The City asserts the impact should be calculated based on the cost to hook up water to the parcel as a whole, treating the parcel as just one lot. This dispute thus involves "the difficult, persisting question of what is the proper denominator in the takings fraction." Palazzolo, 533 U.S. at 631. Put another way:

> [b]ecause our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'

Murr v. Wisconsin, 582 U.S. 383, 395 (2017) (alteration in original) (citation omitted).

-13-

This is known as the denominator problem, and the Supreme Court has addressed it. See Murr, 582 U.S. at 395. In Murr, the Court was tasked with determining "the proper unit of property against which to assess the effect of the challenged governmental action." Id. In other words, the Court had to determine whether to evaluate a takings claim by considering a piece of property as one single lot or as multiple separate lots. And "[a]s commentators have noted, the answer to this question may be outcome determinative." Id.

The Supreme Court announced a multi-factor test, in which "no single consideration can supply the exclusive test for determining the denominator." Id. at 397. Courts are to consider a number of factors, including: (1) "the treatment of the land under state and local law," (2) "the physical characteristics of the land," and (3) "the prospective value of the regulated land." Id. The Court further directed the inquiry to be an "objective" inquiry of "whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." Id. This analysis is undertaken by courts as "a question of law based on underlying facts." See Lost Tree Vill. Corp. v. United States, 707 F.3d 1286, 1292 (Fed. Cir. 2013); see also Murr, 582 U.S. at 405 (noting that courts define the parcel).

Here, the Murr factors favor treating the parcel as one singular lot. As to the first prong of the Murr test, the land is still characterized as one parcel under local law.[9] On the second prong, courts look to the "physical relationship of any distinguishable tracts, the parcel's topography, and the surrounding human and ecological environment." Murr, 582 U.S. at 398. Here, Jefferson County maps show that the parcel is contiguous, divided only by one road. And third, assessing "the

---

[9]The lot that was sold to the Browns is characterized separately from the remaining 156 acres still owned by the trustees. The trustees further argue that they are not required to seek approval from the City to subdivide their property into lots of five acres or more. But even if the trustees are not legally compelled to subdivide their property with the City, the fact that the property has not formally or legally been subdivided is still relevant to the Murr analysis.

value of the property under the challenged regulation," see id., the trustees have admitted that it would cost *more* (and thus decrease the value of the property more) to extend the water to all eight proposed subdivided lots than to just one parcel. Furthermore, there is no clear limiting principle to the trustees' argument; if the trustees are permitted to treat their property as eight parcels for purposes of takings analysis, they could also argue their property should be treated as 16, or 32, or 64 different parcels needing water connections. The lot was purchased as one lot, annexed to the City as one lot, inherited by the trustees as one lot, and initially advertised for sale as one lot until the trustees decided it would better sell subdivided. The trustees have not provided sufficient justification to begin treating it as eight different lots now.

2.

Considering the trustees' property as a whole, the district court was correct to determine that no reasonable fact finder could conclude that the regulations here constitute a taking under the Penn Central balancing test.

The first prong of the Penn Central balancing test considers "the regulation's economic effect on the landowner." See Palazzolo, 533 U.S. at 617.

Here, the district court correctly found that this factor weighs in favor of the City because the trustees failed to demonstrate the regulations impose a significant economic impact on the parcel as a whole. At summary judgment, "[t]he moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." Bedford, 880 F.3d at 996. In this case, the trustees have presented no evidence that there is a significant economic impact in connecting City water to the property as a whole. The trustees acknowledged in a deposition that they had not considered what it would cost to run water to just one point of the tract, and that they had only inquired with the City

-15-

about connecting water to all eight subdivided parts of the property. The expert report that the trustees rely on does not consider the cost to run water just 228 feet to the nearest point of the Property. And even the expert's affidavit asserted only that "the cost to the Trust of extending the City water system to the Property *made the development for that highest and best use* economically unfeasible," with no mention of the economic impact for a use other than subdivided lots. But the fact that an ordinance "deprives the property of its most beneficial use does not render it unconstitutional" if the "ordinance is otherwise a valid exercise of the town's police powers." Goldblatt v. Town of Hempstead, 369 U.S. 590, 592 (1962). Because the trustees have not met their burden of establishing a severe economic impact on the whole parcel as a result of the regulations, this prong favors the City.

The second prong of the Penn Central test considers whether and how much the regulation of the trustees' property interfered with the trustees' "reasonable investment-backed expectations." See Palazzolo, 533 U.S. at 617. A reasonable investment-backed expectation requires "more than a 'unilateral expectation or an abstract need.'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984) (citation omitted). The reasonableness of an expectation may be shaped by "the regulatory regime in place at the time the claimant acquires the property." Palazzolo, 533 U.S. at 633 (O'Connor, J., concurring); see also Murr, 582 U.S. at 405 ("Petitioners cannot claim that they reasonably expected to sell or develop their lots separately given the regulations which predated their acquisition of both lots."). Investment-backed expectations are often "informed by the law in force in the State in which the property is located." See Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 38 (2012).

Here, the trustees failed to show that the City's regulation interfered with reasonable, investment-backed expectations. The trustees assert that they had an expectation that the Property could be developed without paying to connect to the City water. But they have not shown how this expectation was reasonable and investment-backed rather than "unilateral." The ordinance prohibiting construction of new private wells had been in place for nearly 30 years when the Trust voluntarily

annexed the Property to the City. While the trustees' claim "is not barred by the mere fact that [the Property was annexed] after the effective date of the [regulation]," see Palazzolo, 533 U.S. at 630, that timing is not "immaterial," id. at 633 (O'Connor, J., concurring). The reasonableness of the trustees' expectations is shaped by the "regulatory regime" that was in place when the Trust annexed the Property—including the ordinance prohibiting private wells. See id. This regulatory regime is further exemplified by evidence showing that at least some other landowners (including the neighboring Eagle Ridge subdivision developer and two individuals who lived outside the City and wanted to tap into the City's water system) paid the costs of connecting to the water system. The fact that the second relevant regulation—the one prohibiting use or occupation of a residential structure—was not implemented until after the Property was annexed does not change this conclusion; the prior existence of the ordinance prohibiting new private wells was sufficient to provide notice that City property is subject to water regulation, and the trustees' primary complaint is directed at the first regulation, not the second.[10] The trustees' "right to improve property" here "is subject to the reasonable exercise of state authority," which includes the enforcement of Hillsboro's land-use restrictions. See Palazzolo, 533 U.S. at 627.

The final prong of the Penn Central test considers the "character of the governmental action." 438 U.S. at 124. This includes inquiring into "whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" Lingle, 544 U.S. at 539 (quoting Penn Central, 438 U.S. at 124).

Here, the district court correctly determined that this factor also favors the City. As discussed in section II.A *supra*, the regulation amounts to a limitation on use, not to a "physical invasion." See Lingle, 544 U.S. at 539. Moreover, City

---

[10]For instance, in Becker's deposition, he testified that "Josh Brown's intention would have been to just have a well" and another interested purchaser likewise wants a private well.

representatives testified that the prohibition on new private wells was likely passed in part to prevent water contamination within City limits and to protect depletion of the aquifer. Weighty public interests alone are not sufficient to transform a *per se* regulatory taking into a permissible regulation. See Lucas, 505 U.S. at 1015 (noting that Loretto and Lucas takings are compensable even when there is a significant public interest). However, the government interest is appropriately taken into consideration under Penn Central analysis. See Murr, 582 U.S. at 405 (determining the third Penn Central prong favored the government in part because the governmental action was enacted as a part of an "effort to preserve the river and surrounding land"); see also Penn Central, 438 U.S. at 125 (noting that the Supreme Court has permitted land-use regulations when the public interest would be promoted by doing so). Thus, this final prong also favors the City.

III.

The Takings Clause is intended "to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo, 533 U.S. at 617-18 (citation omitted). But here, the trustees seek to have the public bear the burden of guaranteeing the trustees the highest and best use of their Property. Rather than pay the cost to connect City water like at least one similarly situated developer has done, the trustees are attempting to transfer their development costs to the City. Neither common sense nor the Takings Clause requires the City to bear this burden.

For the foregoing reasons, we affirm the judgment of the district court in its entirety.

_____