IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Protection Order for<br><br>KARRI LEE ARELLANO,<br><br>                          Respondent,<br><br>        and<br><br>GEORGE HAMMER,<br><br>                        Appellant. | No. 88395-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Kerri Arellano obtained an antiharassment protection order against neighbor George Hammer after a dispute arose concerning a gate across the roadway providing access to both parties' properties. The commissioner granted Arellano's antiharassment protection order. Hammer moved for revision of the commissioner's order. The court denied Hammer's motion. Hammer appealed, claiming the trial court misconstrued the evidence, misapplied the law, and violated his due process rights. We disagree and award Arellano fees on appeal.

FACTS

Kerri Arellano and George Hammer are neighbors. Their properties have a shared easement, allowing both Arellano and Hammer to access a public road. Hammer installed an electric gate on the easement, which was controlled by a

"clicker."[1]  The gate will not automatically open or close without the use of a clicker.

On March 6, 2025, law enforcement responded to a call from Arellano, who reported that Hammer closed the gate on her vehicle before driving off. Arellano recounted to Officer Grant Soule that she was driving down the road behind Hammer when he stopped immediately past the gate and blocked the road.  Arellano saw Hammer activate the gate, and it closed on her car.  Arellano said she could hear a beeping noise after the gate closed, indicating the clicker was being hit multiple times "to effectively get the gate to forcibly close into the vehicle."  Officer Soule reported Arellano sounded "extremely frustrated" and could hear her crying on the phone.  Arellano stated this was a "non-stop issue with Hammer and that she wants it to stop."

By the time Officer Soule arrived on scene, Hammer had left.  When Officer Soule approached Arellano's car, he "could see that the gate was in fact partially closed and pressed up against [Arellano's] vehicle."  He noted there were scrapes on Arellano's car and she did not "have a way to get the gate to open back up."  Arellano explained to Officer Soule that after Hammer installed the gate, he only provided one clicker to her family, and the remote stopped working.  As a result, she had to build a second "road" around the gate to get in and out of her neighborhood.

In his report, Officer Soule noted "[t]here is extensive call history between Arellano and Hammer, including but not limited to disturbances, court order

---

[1] "Clicker" is used synonymously with "remote control."

violations, civil complaints, and paper services where Hammer was served with a court issued protection order." Most of the calls to 911 were initiated by Arellano bringing complaints against Hammer for his behavior and actions. Officer Soule attempted to contact Hammer that day, but he reached Hammer's voicemail and left a message.

The following day, Officer Soule spoke with Hammer at his home. Hammer told Soule, "I'm not really sure if I want to talk to you guys because I don't want to feed into [Arellano's] delusions." Hammer denied anything happening with Arellano the day before and proceeded to show the officer footage he had taken earlier in the week of Arellano yelling at him. When Office Soule asked Hammer if he "saw Arellano . . . at all," Hammer became argumentative and diverted the questions back to the video of Arellano. Officer Soule told Hammer he would be referring charges on him to the prosecutor. Hammer did not acknowledge the statement and continued to talk about the video of Arellano.

Officer Soule told Hammer he would be leaving if Hammer did not want to talk more about the incident from the previous day. Hammer stopped talking about the video and said, "She got behind my motorhome and I can't see behind my motorhome." Hammer then went back to talking about the issues he had with Arellano. Officer Soule noted Hammer was "extremely argumentative with us and displayed a clear dislike if not hatred for Arellano," and would try to deflect the conversation away from the incident with the gate.

Officer Soule concluded his report by stating, "Based on the above circumstances I developed probable cause on Hammer for RCW 9A.49.090 (Malicious Mischief 3rd degree)." Officer Soule noted he believed "Hammer's actions appeared deliberate in nature and his seeming lack of remorse after driving off showed a malicious intent inflict damage on [Arellano] vehicle and potentially trap [Arellano] next to the gate."

In April 2025, Arellano moved for a protection order. The court denied the motion and ordered the case to be transferred to superior court, explaining "the action would affect the use or enjoyment of real property for which the respondent has a cognizable claim." On May 16, 2025, Arellano and Hammer appeared in court for a hearing on the motion for a protection order.

During her argument to the court, Arellano described the "substantial and escalating pattern of harassment" that Hammer engaged in. She explained how Hammer had installed surveillance cameras along the property line, aimed at her home, and had violated her family's privacy and safety. When Arellano built a fence to block the cameras, he moved them higher. She stated that Hammer's actions had "caused significant emotional distress." She also described Hammer trespassing onto her property and "climb[ing] a ladder to film us over the fence."

Arellano also discussed the gate, noting that despite multiple requests, Hammer failed to provide reliable access. Arellano described a time when her daughter was choking and first responders struggled reach her home because the gate would not open. Arellano also described for the court the incident when Hammer closed the gate on her vehicle. Arellano concluded by stating,

"Hammer's actions are not isolated and accidental; they're targeted, sustained and deeply hurtful. My family, especially my children, live in fear and under constant surveillance."

Hammer denied Arellano's allegations. He maintained he installed the gate at Arellano's request, and Arellano was upset because she believed he was trying to extort money from her for the cost of the gate. Concerning the clicker for the gate, Hammer stated Arellano asked for five clickers and he told her that she can get duplicates online. Hammer then played the video of the gate incident for the court. When the court asked Hammer what he thought the video showed, Hammer replied, "It shows that [] the gate was lightly on her back bumper, that her daughter could have moved it away easily. They distracted the camera, they moved the car and caused damage to where she wanted it to be."

Hammer attempted to show the court other videos and pictures, alleging they would depict Arellano's aggressiveness and hostility, but the court noted it was "acutely aware that there's hostility in this situation," and unless the evidence showed something else, it would not admit the evidence. Additionally, the court was concerned that in one of the videos, it appeared Hammer was recording Arellano without her knowing:

> The Court: All right, can I ask you about this? This – the camera appears to be pointed down. Was she aware that she was being recorded?
>
> Mr. Hammer: No.

The court allowed Hammer to admit two videos: the one involving the gate incident and another where Arellano discusses easement issues with Hammer.

5

The court began its ruling by stating the definition of harassment under RCW 7.105.010(37)(a). The court continued by observing there was a clear existence of a dispute and the allegations that Hammer had pointed surveillance videos towards Arellano's property and recorded Arellano without her knowledge were "unrefuted." The court acknowledged that Arellano is "savvy enough" to go online and get information about a clicker, but Hammer was the individual "that has all the information regarding the clickers."

Concerning the gate incident, the court concluded Hammer's interpretation of the events was not what was reasonably depicted from the video evidence: "Hammer wants the Court to believe that it shows [Arellano] staging an incident. What I watched was somebody that was stuck at the gate that clearly did not have a clicker." The court noted Arellano's daughter clearly could not pull the gate off the car, and the police report indicated the car was stuck when Officer Soule arrived. As to Hammer's claim that Arellano's daughter walked off camera knowing the camera would follow her, so Arellano could move the car and purposefully cause damage, the court found this explanation not credible. Instead, the court found that Arellano's daughter "walks away from the camera clearly upset. She notices the camera following her, and she walks forward to see if it follows her everywhere she goes, and it does. She didn't know that before she backed up."

The court concluded:

[T]he court finds [Arellano]'s version of events to be more likely true. She's the more credible party in this matter. It's clear to the Court that this has gone beyond just a dispute and has devolved

into [Hammer] engaging in acts of harassment against [Arellano], including recording her when she's not aware of it, including the Court finds it more likely than not, sir, that you did close that gate on her.

The court also found Hammer's actions caused "substantial emotional distress" to Arellano and "would cause any reasonable person substantial emotional distress were this kind of behavior to be directed at them." The court granted Arellano's motion for an anti-harassment order.

The court worked with Arellano and Hammer to understand the distance from Arellano's property line to Hammer's shop and home, so it could determine the protection order's restrictions. Arellano noted her house was about 100 feet from the property line, and Hammer indicated the same for his home.[2] But, Hammer stated his shop was only five feet from the line. Ultimately, the court determined that Hammer was to stay 100 feet away from Arellano when she was on her property and 1,000 feet away when they were in the community. The court also ordered Hammer to surrender his weapons.

Hammer moved for revision of the commissioner's order. In addition to continuing to deny the claims discussed in the first hearing (i.e., his security cameras were only for protection, he did not close the gate on Arellano), Hammer contended "[t]oo much emphasis was placed on [Arellano's] emotion display," and "[t]he court then issued an emotionally driven order to surrender all weapons." After hearing arguments, the court took the matter under advisement. The court denied revision. Hammer appealed.

---

[2] Arellano estimated it was closer to 200 feet.

7

ANALYSIS

Hammer contends the trial court erred when it denied his motion for revision because it (1) misconstrued the evidence and relied on unsupported factual findings, (2) misapplied the law, and (3) violated his substantive due process rights. We disagree.

We review the denial of a motion for revision for an abuse of discretion. *In re Domestic Violence Protection Order for Timaeus*, 34 Wn. App. 2d 670, 676, 574 P.3d 127 (2025). A court abuses its discretion if its decision is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *In re Receivership of Applied Restoration, Inc.*, 28 Wn. App. 2d 881, 891, 539 P.3d 837 (2023) (internal quotation marks omitted) (quoting *MONY Life Ins. Co. v. Cissne Fam LLC*, 135 Wn. App. 948, 952-53, 148 P.3d 1065 (2006)). It is an abuse of discretion to rely on facts unsupported by the record. *State v. Greenfield*, 21 Wn. App. 2d 878, 887, 508 P.3d 1029 (2022). We review questions of law de novo. *Knight v. Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

We review a trial court's findings for substantial evidence. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). "Evidence is substantial when sufficient to persuade a fair-minded person of the truth of the matter asserted." *Timaeus*, 34 Wn. App. 2d at 679. We defer to the trier of fact on questions of witness credibility, conflicting testimony, and persuasiveness of the evidence. *Knight*, 178 Wn. App. at 937.

Factual Findings

Hammer contends the trial court misconstrued the evidence and relied on facts unsupported by the record. Specifically, Hammer alleges the trial court erred when it found (1) Arellano did not intentionally damage her car on the gate, (2) Arellano's daughter could not have easily moved the gate, (3) Arellano's daughter did not know the camera was following her movements, and (4) Hammer did not refute Arellano's allegations of video surveillance. We disagree.

First, Hammer contends the trial court erred when it found that "Arellano merely followed her daughter's instructions to try [to] drive out." The court never indicated that Arellano was only responding to her daughter's instructions. The court, after watching the video, merely noted that Arellano's daughter instructed Arellano to back up and Arellano tried that, but the court never said Arellano did not try and move the car on her own accord.

Next, Hammer claims the trial court erred when it found Arellano's daughter could not have easily moved the gate off the car. However, the court watched the video and stated, "I watched her try to pull the gate off the car. It wasn't easy." The video shows Arellano's daughter leaning back to pull the gate and quicky releasing it, indicating it was too heavy to continue to pull. Because we defer to the trial court concerning persuasiveness of evidence and conflicting testimony, we will not disturb these conclusions.

Third, Hammer challenges the trial court's finding that Arellano's daughter did not know the camera would follow her movements. Hammer claims the only

9

purpose of Arellano's daughter moving off camera was to move the car out of view so Arellano could intentionally damage her vehicle. The video supports the court's finding that Arellano's daughter walked away from the camera and then was surprised to see it following her. But, even if Arellano's daughter knew the camera was there, it would not affect the court's conclusion that Hammer, not Arellano, caused the damage to the car, because the video was not the only evidence the court relied on. The court also considered Officer Soule's report, which indicated the car was stuck and Arellano could not move without causing damage to her vehicle, and Arellano's testimony, which the court found more credible than Hammer.

Finally, Hammer maintains the court erred when it found Hammer did not refute Arellano's allegations that Hammer was using his cameras to record her and her family. Hammer's claim misconstrues the court's statements. The court did not say it was undisputed that Hammer was using his cameras to record Arellano, the court said it was undisputed Hammer had his surveillance cameras pointed at Arellano's property. This finding is supported by Hammer's own testimony where he admitted he had recorded Arellano without her knowledge and had cameras pointing at the property line between their homes.

The court's findings are supported by substantial evidence in the record, including its assessment of the credibility of witnesses, which we do not disturb on appeal. The court did not abuse its discretion.

Application of Law

Hammer claims the court erred when it determined harassment occurred because (1) the court never applied the factors of RCW 7.105.010(7)(b), (2) no evidence of substantial emotional distress existed, and (3) Hammer never engaged in a "course of conduct."[3]  We conclude the trial court properly applied the law.

Under RCW 7.105.225(1)(f), "[t]he court shall issue a protection order if it finds by a preponderance of the evidence that the petitioner has proved . . . that the petitioner has been subjected to unlawful harassment by the respondent."  "Unlawful harassment" can be proved in two ways:

> (a) A knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner; or
>
> (b) A single act of violence or threat of violence directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose, which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner. A single threat of violence must include: (i) A malicious and intentional threat as described in RCW 9A.36.080(1)(c); or (ii) the presence of a firearm or other weapon.

---

[3]  Hammer also claims the trial court erred to the extent it treated the gate incident as a "single act of violence" and based its finding of unlawful harassment on that incident.  But the court did not predicate the antiharassment order on a single act of violence under RCW 7.105.010(37)(b), it based the order on a "course of conduct."  The gate incident was merely the basis for including the "no harm" provision in the order.

RCW 7.105.010(37). A "course of conduct," as put forth in subsection (a), requires "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 7.105.010(7)(a). "Course of conduct" may include any form of communication, except constitutionally protected communication. RCW 7.105.010(7)(a).

To determine whether a course of conduct serves any legitimate purpose, the court should consider the following:

> (i) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;
>
> (ii) The respondent has been given clear notice that all further contact with the petitioner is unwanted;
>
> (iii) The respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner;
>
> (iv) The respondent is acting pursuant to any statutory authority including, but not limited to, acts which are reasonably necessary to:
>
> > (A) Protect property or liberty interests;
> >
> > (B) Enforce the law; or
> >
> > (C) Meet specific statutory duties or requirements;
>
> (v) The respondent's course of conduct has the purpose or effect of unreasonably interfering with the petitioner's privacy or the purpose or effect of creating an intimidating, hostile, or offensive living environment for the petitioner; or
>
> (vi) Contact by the respondent with the petitioner or the petitioner's family has been limited in any manner by any previous court order.

RCW 7.105.010(7)(b).

Here, to issue an antiharassment protection order, the court needed to find that Hammer subjected Arellano to unlawful harassment either under

12

RCW 7.105.010(37)(a) or (b). Under subsection (a),[4] the court had to determine Hammer engaged in a knowing and willful course of conduct, which served no legitimate purpose, and resulted in Arellano suffering substantial emotional distress.

### 1. Legitimate Purpose

Hammer contends his actions served a legitimate purpose, and the court erred when it did not address the factors under RCW 7.105.010(7)(b). While the court did not address the factors explicitly, it's findings touched on the relevant factors, and it did not err by not finding a legitimate purpose.

Here, Hammer maintains applying the factors of RCW 7.105.010(7)(b) supports his position that he was operating the cameras for the legitimate purpose of protecting himself and his property. Hammer claims factor one supports this position because he had not "said one word to her in a year and a half, two years." But Arellano mentioned instances of Hammer trespassing on her property and filming her and her family. Hammer conflates initiating contact with speaking the first word or speaking at all. With regard to factor two, Hammer maintains Arellano has never included in a sworn statement clear notice that all future contact is unwanted. The court could conclude from the evidence —including Arellano's multiple calls to law enforcement and videos Hammer presented—that further contact was unwanted. As to the third factor, the court found Hammer's conduct "has gone beyond just a dispute and has devolved into Mr. Hammer engaging in acts of harassment against Ms. Arellano." The court—

---

[4] In its oral ruling, the court found harassment under subsection (a).

relying on Hammer's video evidence, the police report, and the parties' testimony—found a pattern of conduct designed to harass Arellano. Finally, Hammer concedes the fifth factor "arguably weighs in Arellano's favor to the extent that she argued the fence line recording had 'the effect [if not the purpose] of creating an intimidating, hostile or offensive living environment' because she disliked any camera usage."[5] (Alteration in original.)

Hammer's actions went beyond the use of cameras to surveil his property. For these reasons, the court did not err by failing to find Hammer's conduct did not serve a legitimate purpose.

### 2. Substantial Emotional Distress

Hammer next contends the court erred when it found Arellano suffered "substantial emotional distress," as required by RCW 7.105.010(37)(a). "Substantial" is not defined by RCW 7.105, but when interpreting a statute, we give words their plain meaning. *In re Marriage of Herridge*, 169 Wn. App. 290, 297, 279 P.3d 956 (2012). Webster's defines "substantial" as "considerable in . . . amount." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1734 (2002).

Washington case law has discussed conduct rising to the level of causing substantial emotional distress. In *State v. Kintz*, Theresa Westfall was walking with her kids when a van repeatedly drove by her, slowing down each time. 169 Wn.2d 537, 540-41, 238 P.3d 470 (2010). The court found this repeated conduct would cause a reasonable person to suffer substantial emotional distress, and

---

[5] Factors four and six are inapplicable since neither party acted under statutory authority and no previous court orders restricting contact existed.

did cause Westfall substantial emotional distress, as evidenced by her "real fear." *Kintz*, 169 Wn.2d at 556. In *State v. Askham*, Gerald Schlatter received multiple, anonymous e-mails threatening to ruin his professional and social life by informing law enforcement about manufactured pornographic activities. 120 Wn. App. 872, 876, 86 P.3d 1224 (2004). Schlatter repeatedly testified that he felt threatened by the e-mails. *Askham*, 120 Wn. App. at 883-84. The court noted the e-mails were the "only evidence in the record that could arguably establish substantial evidence of emotional distress," but found "that a reasonable fact finder could find that the course of conduct was such as would cause emotional distress and that it did in fact cause emotional distress." *Id.*

Here, Hammer contends "at best Arellano suffered mild annoyance" from the security cameras, and the gate incident "could only be deemed 'generally emotionally disturbing.' " But substantial evidence in the record supports a finding that Arellano suffered substantial emotional distress. Arellano testified Hammer's actions "shattered" her family's sense of safety and they "live in fear" of Hammer's constant surveillance. Arellano described multiple incidents where she was denied access to her property via the easement and where Hammer vandalized her property. Officer Soule's report noted "Arellano sounded extremely frustrated . . . and at one point I could hear her begin to cry as she talked about how this has been a non-stop issue with Hammer and that she wants it to stop."

Because substantial evidence exists in the record to support a finding that Arellano suffered substantial emotional distress, the lower court did not abuse its discretion.

Due Process

Hammer maintains the court applied the antiharassment statute in an unconstitutional manner by depriving him of his use and enjoyment of real property. We conclude the antiharassment statute is constitutional as applied to the facts of this case.

Challenges to the constitutionality of a statute are questions of law and reviewed de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). Both the United States Constitution and the Washington State Constitution guarantee that individuals will not be deprived of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1; CONST. art. I, § 3.

An as applied challenge to the validity of a statute " 'is characterized by a party's allegation that application of the statute in the *specific* context of the party's actions or intended actions is unconstitutional.' " *Fields v. Dep't of Early Learning*, 193 Wn. 2d 36, 434 P.3d 999 (2019) (quoting *Moore*, 151 Wn.2d at 669). If a statute is unconstitutional as applied, future application in similar contexts is prohibited, but the statute is not completely invalidated. *Moore*, 151 Wn.2d at 669. We assume statutes are constitutional, and the burden to prove unconstitutionality is on the challenger. *City of Seattle v. Evans*, 184 Wn.2d 856, 861-62, 366 P.3d 906 (2015).

16

A law regulating the use and enjoyment of property is unconstitutional only if it " 'fails to serve any legitimate governmental objective,' making it 'arbitrary or irrational.' " *Yim v. City of Seattle*, 194 Wn.2d 682, 694, 451 P.3d 694 (2019) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005)). Under RCW 7.105.310, "the court shall have broad discretion to grant such relief as the court deems proper, including an order that . . . [r]estrain[s] the respondent from knowingly coming within, or knowingly remaining within, a specific distance from a specific location."

Here, the protection order served the legitimate interest of protecting Arellano and her family. Hammer contends the trial court could have imposed narrower restrictions by using the property line as a divider, but the court was not required to impose the least restrictive means. Additionally, the court questioned how law enforcement could enforce an order that says, "respect the property line." The court took testimony from both parties concerning the distance of their houses from the property line and tailored the order in such a way that would allow Hammer full use of his property and only limit use if Arellano was within 100 feet of Hammer:

> Mr. Hammer is to stay 100 feet away from her when she is on her property. So if you see her, you need to stay a hundred feet away. Beyond that, if you see her out in the community, you are not to approach within a thousand feet of her, her vehicle, her workplace.

The court used its discretion to determine 100 feet was an appropriate distance to maintain Arellano's safety while still allowing Hammer use of his land.

Because the court's order served a legitimate governmental interest and did not unreasonably restrict Hammer's use of his property, we conclude no constitutional violation occurred.

### Attorney Fees

Arellano requests attorney fees on appeal under RAP 18.1, RCW 7.105.310(1)(j), and RCW 4.84.185. Hammer contends fees are not warranted because his appeal was proper and not frivolous.

RAP 18.1 provides that applicable law may grant a party the right to recover reasonable attorney fees or expenses on review. When a court grants a protection order, the court may "[r]equire the respondent to pay the administrative court costs and service fees . . . including reasonable attorneys' fees." RCW 7.105.310. Additionally, a court may award attorney fees if "the position of the nonprevailing party was frivolous and advanced without reasonable cause." RCW 4.84.185.

We conclude Arellano, as the prevailing party in this action, should be awarded fees under RCW 7.105.

We affirm.

_____, J.

WE CONCUR:

_____, J.   _____, J.

18